The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right, be seated. The final case is the Prudential Insurance Company of America v. Shenzhen Stone Network. Mr. Barlow. Good morning, Your Honors, and may it please the Court. Benjamin Barlow for the appellant, Shenzhen Stone. Your Honors, as a brief introduction, my client appeals the decisions below on three grounds. And we're talking about two separate decisions. There was an early decision on a motion to dismiss based on the concept of in-rim jurisdiction. And then there was the decision immediately below on summary judgment that's being appealed. The three reasons my client appeals. First, the district court erred in exercising in-rim jurisdiction when personal jurisdiction was available over the board. The domain name registrant, if not at the time of filing, as soon as a responsive filing was made in the case. A subset of that, waiver is not an issue in this case. In-rim is jurisdiction over a piece of property. It was raised at the trial court level. It was raised in the consolidated briefs on appeal. And it deals with jurisdiction over the property itself. So dismissal of an individual, the registrant, Mr. Zhang, doesn't affect that question of whether in-rim jurisdiction is properly exercised over the piece of property. Two, the district court erred in finding that registration under the Anti-Cyber-Squatting Consumer Protection Act encompasses re-registration. Registration in the context of the ACPA is clearly dealing with the fact that it's dealing with the creation event that results in the creation of a domain name. The event that puts all on notice that there's an existing domain name out there. So if you're trying to get your trademark, you know that someone has a domain name that you're not going to be able to get. We haven't spoken on this issue, but other courts have. Is there any disagreement with the other courts on that issue? Yes, Judge Floyd, there indeed is. I believe that when we address the issue this morning, that this court hopefully will reach the logical conclusion that the Ninth Circuit applied in the Gopetz decision. Where registration is that original registration and not a re-registration with a new registrant. There have been other cases. The Visor case in the District of Columbia goes along with Gopetz. But then there's the Xerxes case in the District of Columbia that tends to take sort of the Third Circuit positioning that's in the Schmidt-Heide case. I believe that case is distinguishable because it dealt with the specific question about registration of an individual's name as a domain name. And whether when the law changed and made that improper, whether a re-registration would relate back. But even the decision below is a little bit inconsistent when it comes to that issue of registration. Because the court focuses, the court interprets the Gopetz decision in the Ninth Circuit as being inapplicable. Because it says really the issue before the court in the Ninth Circuit that they felt was important was the fact that the transfer of a domain name there was to an associated entity. A brother transferred a domain name to an entity that was co-owned by his brother and himself. But that wasn't the issue. The court below thought that we were talking about the importance of the Gopetz decision was because you had a transfer to a related entity. But that was not the Gopetz holding. The Gopetz holding is crystal clear that a re-registration to a new registrant isn't registration for purposes of the agency. It's registration for purposes of the ACPA. Aren't we, wouldn't we be rewriting the statute? I mean, the statute talks about registration. It doesn't say initial registration. So why, I mean, why would we limit it to the initial registration? I think that's an important question, Judge Diaz. And I think the issue is that to interpret the statute the way Prudential is arguing that the statute should be interpreting, it's not adding words. It's doing the ultimate elevation of form over substance. It's saying because you have the word registration and then you talk about a re-registration, no matter what's really happening when something is re-registered, just because you have the word registration encompassed in re-registration, that those have to be the exact same situation that we're talking about. But the context makes clear that it's not. The context makes clear that what we're talking about, and this is what the Ninth Circuit focused on in GO-PETS, what we're talking about is the creation of property rights in a domain name. In the Booking.com decision that the Supreme Court had, they acknowledged that a domain name confers valuable property rights. But what the Ninth Circuit said is that if you create a domain name and you have valuable property rights in that domain name, if we say that a re-registration is the same thing that happened when you registered and created the name in the first place, what we're telling people who register domain names is that their property rights in their domain name are always subject to someone else's decision to trademark a name. Isn't the purpose of the ACPA to eliminate cyber squatting? And so why logically wouldn't we consider re-registration as being available? Judge Floyd, I believe, I think it's clear even, I think it's JA-223, if I'm right, that's the court's decision below. Where even the court says at the end of it, it says clearly re-registration to a related entity is not the same as registration. The court makes the distinction and says, well, re-registration's not really registration. That really what we're focused on is the transfer or assignment of interests. And when you get to that point, you go straight into the Ninth Circuit's ballywick by saying that if you tell someone that they can create property rights in a domain name in good faith because there's no existing trademark out there, then if somebody later, somebody like Prudential who was on notice that they did not have the property rights, they had a crew.com domain name, they knew that going in when they got their trademark. If you let that trademark owner then just sort of lie in wait for a person to want to sell their domain name or transfer their domain name, I don't understand the court's distinction below because I don't know why that would be, I don't know why the transfer would make a lot of difference if you're transferring to your mother or your brother or your sister or a related business. It's the transfer that the court's talking about. And the Ninth Circuit said that if you adopt that understanding of re-registration, what you're doing is you're making those property rights in the domain name inalienable. People can't sell the rights. There's no, the Ninth Circuit in the Heist situation, there was a gentleman named Heist that owned GoBets domain name. They said that there's no question that if Mr. Heist had just retained ownership of his domain name, that he could have used it however he wanted to. So why wouldn't he be able to sell the totality of rights that he has in that piece of property to someone else? The alternative approach would be to say that someone's later registration of a trademark should make, should affect your ability to sell, it should affect the type of people you can sell to. Maybe you can only sell to a person that you're related to or a business that you have ownership in, but it restricts your right to sell. Mr. Barlow, I'm sorry to interrupt you, but I'm not sure that you answered Judge Floyd's question. The purpose of the statute is to prevent bad faith registrations, cyber squatting of domain names for a non-legitimate purpose. And if that's the purpose, why does it matter whether someone does that on the initial registration or on re-registration? Judge Diaz, I think I would take a step back and absolutely. The ACPA, the intent is to prevent cyber squatting. The reason I think what you should look at, the registration you should look at under the ACPA is the original one. And there's no question here that the original re-registration, there was no pru.com or pru trademark. So there's no question that that was registered or there's been no argument that that was done in good faith. I think that the question I think the court should look at is the concept of notice that flows throughout the Trademark Act. What we're concerned about is just as a domain name registrant, when they register, when they create a domain name, and they are on notice that there's an existing trademark, they know that they're running a. So your answer is that it's not bad faith that we need to consider, it's whether there was notice or not? I think, no, I think we look, I'm sorry. I'm just trying to get the answer. Well, I think you do look at bad faith, but you look at bad faith at the time of the original registration. Why is that? Because when that original registration happened, when the domain name was created, there was no trademark. Those rights in the domain name were created and sprung up and they didn't have anything to do with a trademark. And the person who owns that initial domain name, who does the initial registration, just as they have the ability to keep it and use it despite the fact that Prudential's registered the Prü trademark, they should have the ability to sell the full panoply of rights that they have in that domain name to anybody else, to transfer it. We shouldn't always be looking in to say, well, did you reregister? I don't think the bad faith analysis is conducted, it should be conducted the same way. I think you should look at bad faith in the creation of the domain. But a reregistration of the domain, a periodic transfer that can happen simply by clicking a button on an email, I don't believe that's what the ACPA is focused on. I think the ACPA is focused on, did someone create a domain name knowing that that domain name was taken from somebody who had a trademark? That's the whole purpose behind the Anti-Cybersquatting Act. It's does somebody create a domain name while knowing that somebody already has that trademark and are they doing it so that they can hold that ransom for that person, so that company has to do it. That's the whole scheme of the Anti-Cybersquatting Act, to make the clock start clicking again every time there's a transfer and then to put it to the court's responsibility to determine whether the transfer happened, I guess, to an acceptable related party or to an unacceptable related party. That seems more difficult than focusing on the creation event. Because I think what's important in the trademark act is when you create a domain name, are you on notice that someone already has a trademark? A trademark owner, when they register their trademark, they're putting everyone on notice that we're claiming rights in this mark. If they know that there's some preexisting use of that mark somewhere else, it's the notice that's important in what they have. And I would suggest that that's the rubric that you should use here in determining whether a registration and a re-registration are synonymous. Because the court below seems to think that re-registration is not synonymous with registration, as long as you're talking about a re-registration by somebody who's related or a related entity. That's not workable for the courts. When you're looking at the assignment of ownership, we don't suggest that for trademarks and copyrights, that when someone assigns their ownership interests in a trademark or copyright, that somehow that starts the clock ticking again. So, for example, if an entity gets a trademark and I register a, or I have infringing use, I have, I don't know, I've printed out banners, I've printed out everything. I'm intending to use their trademark when I'm first available, when I can first use it. Do I just need to wait until they transfer or assign ownership of that trademark to someone else and try to, in that brief window of time, start my infringing use? And does that get me off the hook? Because somehow they've assigned, their ownership is what they assigned to someone else. Is that less than what they created for themselves when they first secured rights in a mark or a copyright? I don't think that's the answer to this question. I think the Ninth Circuit's position on this is logical and makes sense. And I don't love the position of coming into the Fourth Circuit and saying, hey, let's do what the Ninth Circuit did. But in this situation, I think they got it right, that the domain name is property rights that are created. And if you let this happen and you consider a re-registration to be the same as the registration, well, then all of a sudden you've limited a person's ability to sell or transfer or assign their property rights. They're either limited in who they can assign those rights to, who they can transfer those interests to, or they're limited because they can only accept offers for the domain name from people who are willing to then go through a cyber-squatting case against them. I would like to turn to the issue of interim jurisdiction as well, but my time's out and I can address any questions related to that in rebuttal. All right. Thank you, Mr. Marlow. Mr. Partridge. May it please the Court, I'm Mark Partridge with Culhane Meadows, appearing on behalf of the plaintiff Prudential Insurance Company of America. Before getting into the remarks I wanted to bring to the Court's attention, I'd like to answer the question that was on the floor. Essentially, the idea I think the Court was asking about is if you register a domain name, does that mean that forever it can never be challenged for bad faith use? And the answer is clearly no, and the argument presented is clearly wrong. Judge Sotomayor, sitting for the Second Circuit years ago in 2002, in the Story v. Cello Holdings case, made the point that a domain name is a contingent right, if anything, contingent upon the fact that it's not being used for bad faith use. As with trademarks, if the use of a domain name changes from a legal use to an infringing use, the Lanham Act applies. The same thing here. If a domain name is changed to an infringing use, it is subject to challenge under the ACPA, under the bad faith clause. And the argument presented in Go Pets, and the argument presented here today, would mean that that was not true. It would create a loophole in the ACPA that essentially would destroy the ACPA from using that statute against a wide range of domain name infringements. Mr. Barlow, I guess you can correct me if I'm wrong, but I thought I understood his argument to be that if Prudential were interested in protecting its interest in the domain name, it should have litigated that issue when the name was first registered. There's nothing in the record to show that that was the time when it was being put to an infringing use. And so it had no obligation to do that. What happened here is in 2017, it was registered by the claimant and put to an infringing use. And at that point, Prudential has the right to bring a case under the ACPA. It is not barred under the ACPA by the fact that there was an initial registration and then a re-registration. And that's the point of the majority of the cases that deal with the meaning of registration. But I'd like to deal with that in a little bit more detail and get into why Judge Ellis was correct in his decision and what it means for this court. So I'd like to address, first of all, the whole circumstances of his ruling for registration. Then, time permitting, turn to the district court's ruling on bad faith here, the summary judgment decision itself, and the safe harbor argument. If necessary, we'll proceed with the in rem argument as well. But our point here is that the motion to dismiss was an appeal filed by Mr. Jane. The summary judgment decision was an appeal filed by Shenzen Stone. There were two separate appeals. This court, the Fourth Circuit, dismissed the appeal filed by Mr. Jane, which covered in rem jurisdiction, and so that is not properly before the court. The only issues raised by Shenzen Stone in its appellate statement filing was the summary judgment issues, and in rem jurisdiction was not at issue on summary judgment. Well, as to their SSN's opening brief, they didn't raise the in rem jurisdiction issue, did they? SSN did not join in that argument about in rem. Jane argued in rem, and then his appeal was dismissed. So is it waived? Yes. We would say it's waived. It's not properly before the court. They did not raise it themselves. Shenzen Stone did not raise it themselves until they got to their reply brief. So it would be waived, but also before it was waived, that appeal was dismissed, and it's not properly before the court. I can turn to more about that later, but I think I'll get to registration if I may. So the issue, just to be clear on where this arises under the statute, the issue that we're talking about for registration is the provision that states that a person may be liable in an action by the owner of a trademark in the case of a trademark is distinctive at the time of registration of the domain name. Here, Judge Ellis correctly found that Prudential's pru trademark was distinctive, at the time claimant registered the pru.com trademark in 2017. Claimant contends that the relevant registration is the initial registration by an unrelated third party in 1997, not claimant's registration in 2010, as discussed. However, the authority they rely on, GO-PETS particularly, the case from the Ninth Circuit, is a discredited minority view, and it's inapposite to this case, as Judge Ellis explained. The court should reject claimant's position on the meaning of registration under the statute as going too far, and recognize Judge Ellis' reasoning as the appropriate approach for a number of reasons. First of all, GO-PETS does not apply here. In that case, the initial registrant re-registered a domain name in the name of a company he owned. That's what Judge Ellis found. It's not a case involving a registration by an unrelated third party who registers the domain name after purchase. That's what we have in the Prudential case. As Judge Ellis notes, those facts are inopposite. So you can take a narrow view of GO-PETS that it applies to the specific circumstance of the case, and those circumstances are not presented here, so GO-PETS does not apply. That's what Judge Ellis said. Well, I mean, but the holding of that case didn't make that distinction, I don't think. It didn't make that distinction, but those were the facts. And when we interpret a case, the narrow view of a case would be to limit it to its facts, rather than take dicta from the case and argue that based on the decision for these facts, we're entering a ruling that will apply to all possible interpretations of this. It suggests that GO-PETS goes too far. But it is not controlling over this Court, and it's not the majority view. The second point I think has already been touched on here, if you look at the plain language of the statute, it doesn't say anything like initial registration, original registration, or anything like that. In fact, the argument of Mr. Barlow was that the registration that matters is the original registration. Well, the words don't say that. And the majority of courts who have addressed this issue are stating that registration includes a registration at a later point in time. That lets you enter the court making an ACPA claim. It doesn't mean you violated the ACPA, but you get to come into court and make your argument that something happened that was in bad faith. And that view is the majority view and is appropriate. And it's consistent with the plain language of the statute. It's consistent with congressional intent. As Judge Floyd pointed out, the purpose, and is admitted, the purpose is to protect trademarks from cyber-squatting. The statute should be interpreted in that light. Opposed limitation would take a large group of cyber-squatting issues and say those simply cannot be brought into court. It would narrow what the ACPA applies to. And that's not the congressional intent. Next, the public policy related to that. What would this mean if you said that the only thing that matters is the first registration? That would mean cyber-squatters could engage in a series of re-registrations, finally for the purpose of using it for an unlawful purpose, and the ACPA couldn't be used. And that's contrary to the story case, the point that Judge Sotomayor was making, that the right under the registration, a contractual right, is contingent upon it being continued to use in good faith. And when those circumstances change, as they did here, you're not barred by the statute from bringing it. The re-registration is a registration that can be brought in before the court. And then there's the authority. Judge Ellis recognized the leading authority here. The Fourth Circuit has not decided on this issue. But Judge Ellis followed a leading case on this, the Jeske case from the Eleventh Circuit. Jeske comes after Gopetz, explains why Gopetz is not the appropriate approach. It treats a domain name as an absolute property right in gross, which is contrary to the purpose of the statute. And instead relies on the plain language of the statute. Registration would include a re-registration, which is a registration. It's not a different thing. There are different registrations along the process. And the way the domain name was registered here, and it's repeatedly acknowledged in the briefing of claimant, is that Shenzhen Stone registered the domain name in 2017. Shenzhen Stone is the owner of that registration. That registration is made by going to GoDaddy and entering into a contract with GoDaddy, which they did in 2017. That's a registration that can be challenged here. The only appellate court that has seen it otherwise predates the Jeske case. That's GoDaddy, as already mentioned. So the most recent case is a case from Utah, in structure, cited in our materials. That, again, is the most recent decision on this topic. And again, it goes through the analysis and explains why the GO-PETS rationale is not correct. That's the infrastructure decision in 2022. So it's quite recent. One of the concerns that was raised is that, well, if you take and say that the registration is a property right, and that this prevents alienation of the right, well, Judge Ellis recognized that that issue can be solved by analyzing the case under the basis of a bad faith factors, not by excluding all of those cases from the ACPA, but by analyzing them and saying, okay, this domain name is not being used in bad faith now. So the ACPA would apply to the new registration, and you'd make an analysis, and under appropriate circumstances, the new owner would prevail. But if they are a cyber-squatter, they would not be shielded by this limited reading of registration proposed by GO-PETS. So that's the prevailing weight of authority. Those are the reasons why that authority is right, and we'd urge the Court to follow that approach and affirm Judge Ellis' ruling on this issue about it. I want to turn to the facts, though, that are before the Court. We contend that the status of the Prue mark in 1997 is not relevant, because the relevant registration is 2017. Claimant says, well, we had no rights to Prue in 1997, and there's nothing in the record that says so. That issue wasn't debated, but there is evidence in the record to show that Prudential had rights before 1997, and that the mark was distinctive. And that evidence is the registration of Prue that came after 1997, it was registered after 1997, but it asserts a first-use date of 1968. That registration constitutes prima facie evidence as a matter of law that those facts are true. Was there a registration in China, and does that matter? It doesn't matter here, Your Honor. China's registration is not at issue. What matters is what happened in the United States. But there wasn't one in China, correct? There was not a registration in China. You're saying it doesn't matter. In 1997, no. This is the issue of was the mark distinctive in the United States to take action under the Lanham Act. So the record has that fact in it. Plus, that shows up with the affidavit of Allison Lazzaro. She also gave evidence that Prue has been widely used in the U.S. and around the world. For as long as anyone can remember as a nickname for Prudential, for the company Prudential. And Prudential has used that trademark for over a century. So Prue is tied to Prudential, and these are undisputed facts would be sufficient to establish distinctiveness for the purpose of the ACPA. So you have the right, the ability to make a decision based on the record before you. Based on this record, the court could find de novo that Prudential's rights in Prue were distinctive at the time in question, even if you have to rely on the first registration, which we believe you do not. The 2017 registration is the correct one to view based on the prevailing authority and Judge Ellis' decision. In short, we feel you should follow the trending weight of authority to decide that that is the right registration. Follow the weight of authority expressed in Jeske, and reject GoPets. In the alternative, you can take a narrower approach, the middle path suggested by Judge Ellis, where GoPets is limited to the narrow facts of the case, a chain of title that doesn't involve the sale to an unrelated third party and then a new registration. Take that narrower view, the path suggested by Judge Ellis. Either way, this court should affirm the ruling that Prudential is entitled to pursue its claim under the ACPA. Even under that narrow rule, though, if a party were to transfer the domain name to a related party and all that happened in bad faith, that's not a workable rule, I don't think. The narrow rule that GoPets only applies, well, we urge you not to follow the GoPets line of authority. We would say that Jeske and the weight of authority is that the statute means registration, which includes a re-registration, a new registration. That brings you into the court, and then you have to analyze whether there's been bad faith to find if there's any liability or not. You're not barred from going into the court because the domain name was registered 20 years ago, and now it's not. Now it's being put to a different use. Talk a minute about the safe harbor argument. Sure, Your Honor. To be short, they attack it. Judge Ellis said, and he's considering the safe harbor, he says, for the reason set forth supra, ACPA's safe harbor does not rescue Shenzhen Stone here. Accordingly, the ACPA's safe harbor does not apply, and the pru.com domain name must be transferred to Prudential. So Judge Ellis considered the defense, it's not something that he just said, no, I'm not going to take a look at that. He considered it, but he concludes that it's not available here, and in doing this, he's consistent with the prevailing law in this circuit. He followed the prevailing law in this circuit, the virtual works case with Volkswagen, which says a defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the safe harbor's provisions. One of the factors in the safe harbor defense is whether the person believed that this was lawful. The second, that's subjective, the second is whether they had reasonable grounds. You have to have both. You have to have a subjective and reasonable grounds to believe the domain name was in fair use or otherwise lawful. Judge Ellis considered these and found that the claimant had failed to present material facts sufficient to create a genuine dispute about a reasonable basis. They did not have a reasonable belief that this was lawful. They did not have a reasonable belief that this was lawful in Judge Ellis' case. Now, what is he doing to decide that? The only evidence presented comes from the self-serving testimony of the company's CEO that is not supported by corroborative evidence. As such, it's insufficient to create a genuine issue. And what's striking is the complete absence of the kind of corroboration you'd expect a company to have. No business plans, marketing plans, no budgets, no documents showing an allocation of resources or people to this project, and no contemporaneous correspondence about what the plan was to do with this. There's nothing like that. The only documents that show up are a handful of things that the judge noted were suspicious, they are not authenticated except by an attorney who lacks personal knowledge, and they appear to all have arisen after this dispute arose, so they're suspicious. At any rate, he found they were insufficient to create a genuine dispute on this issue of whether they believed that what they were doing and had a reasonable basis. They had reasonable grounds for believing what they were doing was lawful. So the safe harbor defense doesn't apply as a matter of law, and it's not appropriate here as a matter of fact. Thank you, Mr. Partridge. Mr. Barlow, you have some rebuttal? Yes, Your Honor. I think her affidavit is being very instrumental in this case. Before we jump on, since there was the issue of facts raised, this Court in Jacobs said that a trial court at the summary judgment stage cannot make factual determinations, cannot make determinations of credibility. If you go to anywhere from JA 1173 and JA 1175 through 1182, you'll see that there is no factual determination of credibility. You will see all sorts of determinations of credibility that were made by the Court below. You will see that the Court, even when describing Mr. Zhang's reasoning for wanting the pru.com domain, the Court refers to it, borrows the Second Circuit's language, that refers to it as more amusing than credible. The problem is that the Second Circuit case that he's talking about was talking about a trial court finding, and that was a bench trial. It wasn't at the summary judgment stage where somebody took a view of two factual statements by each party and then determined that one was credible and one wasn't. For example, as to the point of knowledge and safe harbor, Judge Floyd, knowledge of pru's trademark, it's undisputed in this case that Prudential doesn't use the name Prudential for the 1.3 billion people that live in China. They use another name. They can't use Prudential there because there's another pru.com. Maybe a jury would hear that and decide, well, Mr. Zhang, Xin Xin, we believe that everybody should know about the big American company that operates in most places around the world. Or maybe a jury would hear that and say, wait, there's another company that goes by pru in China? That seems like it might be plausible that somebody who registers a domain name from China where Prudential does not use the trademark pru would have a good faith argument that they operated out of good faith. One of the problems with Judge Ellis' recounting in the court below, instead of saying Judge Ellis, the court below's approach to the factors is a lot of those factors, finding bad faith, are dependent on finding that a re-registration is a good thing. A re-registration is a registration. So you're starting from the default position of saying that somebody created a domain name knowing that they were in conflict with an existing trademark. That's the whole purpose of the Anti-Cyber Squatting Act. We're not saying that cyber squatters should be protected or that trademark owners shouldn't have recourse to the courts. We're simply saying that the real purpose of the act is to protect trademark owners from people who see distinctive marks and go out and create domain names for those marks before the trademark owner can do so. And then hold those marks ransom for a huge payday. That's not what we're talking about with re-registration because in the case of re-registration, there's already been a domain name existing. All we're asking is that you balance the interests of people who created property rights in a domain name. And before your time runs out, could you respond to the argument about waiver of the NREM jurisdictional issue? NREM, it was a consolidated brief, a consolidated opening brief. The dismissal of Mr. Zhang out of that consolidated brief doesn't erase the issue that the issue that was on appeal was the improper exercise of NREM jurisdiction over the NREM jurisdiction. It was jurisdiction over the domain name. Mr. Zhang, if there were other parts of the appeal that dealt with relief that Mr. Zhang individually was seeking, well, then those might be arguments that were waived by Mr. Zhang. But the NREM part of that argument deals with the court's jurisdiction over the domain name, which no one disputes was still a part of the case after Mr. Zhang left. One thing that I would like to point out, try to point out as quick as I can, my colleague mentioned GoDaddy in Arizona. My colleague knows that by registering with GoDaddy in Arizona, that the GoDaddy terms and conditions require parties to consent to jurisdiction in Arizona of disputes with third parties regarding those domain names. As you look at the NREM issue, I would like to direct the court to look at the complaint itself where Prudential first asserts that NREM is possible. Prudential says on April 22, 2020, that they had received a bad e-mail address. They had gotten a bounce back and that they may not be able to exercise personal jurisdiction. Not upon information and belief we will not be able to exercise personal jurisdiction over anybody. We may not. One thing they didn't say in that initial complaint is that a month before, they had gotten Mr. Zhang's information. They had his correct e-mail that both parties had been engaged in Arizona in the UDRP proceeding out there. They had every reason to believe when they filed their complaint that Mr. Zhang was not an unknown foreign person that was out of the picture. And all that was left for them was to try to exercise jurisdiction over the domain name. They knew that Mr. Zhang existed, that he was contesting the transfer of the domain name, and that he had been subject to Arizona action over that matter. Either way, the NREM part of the Anti-Cybersquatting Act talks about if the court decides that personal jurisdiction was not available, the court deciding means that they are not eligible to exercise jurisdiction over the domain name. It means that that issue has been put before the court. In the court below's decision on the motion to dismiss, it's wrong. Equating NREM jurisdiction to diversity jurisdiction is wrong. Diversity jurisdiction is a tool where all we are concerned with is the location of parties on the date that an action is filed. To equate that with NREM jurisdiction, jurisdiction over a piece of property, we're not talking about the same animal. What we're talking about when we're talking about NREM jurisdiction is people's substantive rights and due process. That is the only recourse someone has to address the situation to file an NREM action over the domain name because no one else is available? Is it that, or do we have a person who from the outset is waving his hand saying, here I am, I am the registrant, I consent to jurisdiction in Arizona? Prudential sites, the Porsche decision, the Porsche decision? Mr. Harlow, you're two minutes over your time, so I need you to wrap up. All I was going to say is that we're a far cry in this case when you make a responsive pleading in consent to jurisdiction. That's a far cry from somebody three days before trial throwing consent to personal jurisdiction in to just throw the whole thing out of whack. And I really appreciate the court's time. Thank you, Your Honors.
judges: Albert Diaz, Stephanie D. Thacker, Henry F. Floyd